01:12:40

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE


GAVRIELI BRANDS, LLC,          )
                               )
              Plaintiff,       )
                               ) C.A. No. 18-462(MN)
v.                             )
                               )
SOTO MASSINI (USA) CORP.,      )
et al.,                        )
                               )
              Defendants.      )


                      Monday, February 11, 2019
                      11:00 a.m.
                      Courtroom 4A


                      844 King Street
                      Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge



APPEARANCES:


              MORGAN LEWIS & BOCKIUS, LLP
              BY:  JOHN V. GORMAN, ESQ.
              BY:  MICHAEL J. LYONS, ESQ.
              BY:  EHSUN FORGHANY, ESQ.


                      Counsel for the Plaintiff


              STAMOULIS & WEINBLATT, LLC
              BY:  STAMATIOS STAMOULIS, ESQ.

                      Counsel for the Defendants

10:47:28

10:47:28

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following hearing was

5  held in open court, beginning at 11:00 a.m.)

6

7

10:58:00  8          THE COURT:  Good morning.  Let's start with

10:58:02  9  some introductions.

10:58:04 10          MR. STAMOULIS:  Good morning, Your Honor, Stam

10:58:08 11  Stamoulis.

10:58:08 12          THE COURT:  You're so used to being the

10:58:10 13  plaintiff, Mr. Stamoulis, that you stood up first, but

10:58:13 14  that's okay.

10:58:13 15          MR. STAMOULIS:  I remarked to Mr. Buckson that

10:58:16 16  I'm a little disoriented because I'm sitting on the wrong

10:58:20 17  side of the courtroom.  I apologize for going out of order.

10:58:24 18          Stam Stamoulis on behalf of plaintiff -- I'm

10:58:26 19  sorry, defendant.

10:58:28 20          MR. GORMAN:  Good morning, Your Honor.  On

10:58:31 21  behalf of the plaintiff, Gavrieli Brands LLC, I'm John

10:58:33 22  Gorman of Morgan Lewis.  With me are my colleagues, Michael

10:58:38 23  Lyons and Ehsun Forghany.

10:58:39 24          THE COURT:  Welcome here.

10:58:41 25          We are here today for arguments on defendant's

10:58:45  1    motion to dismiss on the jurisdictional basis and on

10:58:53  2    plaintiff's motion, discovery dispute motion.  And I have

10:59:01  3    allotted thirty minutes.  You can use your time however you

10:59:04  4    choose.  I don't know if you have a preference on which

10:59:07  5    motion goes first.  I don't.

10:59:09  6              MR. GORMAN:  Well, Your Honor, we spoke

10:59:11  7    beforehand.  I think what we agreed, depending on what Your

10:59:15  8    Honor wants to do, is that the parties will address both

10:59:18  9    motions at the same time, one party goes and then the other

10:59:21 10    party goes to address both.  If it suits Your Honor, we

10:59:24 11    would go first.

10:59:24 12              THE COURT:  Sure.

10:59:27 13              MR. GORMAN:  Mr. Lyons will be doing the

10:59:29 14    argument, Your Honor.

10:59:30 15              THE COURT:  Thank you.

10:59:31 16              Mr. Lyons, did you come down from Philadelphia?

10:59:37 17              MR. LYONS:  From California, Your Honor.

10:59:39 18              THE COURT:  So lucky you with the snow.

10:59:41 19              MR. LYONS:  No, beautiful, actually.  It's nice

10:59:44 20    to see a little every year.

10:59:46 21              THE COURT:  Thank you for braving it.

10:59:48 22              MR. LYONS:  Well, good morning, Your Honor.  And

10:59:51 23    as Your Honor mentioned, there are two motions that are on

10:59:53 24    the calendar for today.  First of all, there is the motion

10:59:57 25    to dismiss both Mr. Pichler as the defendant personally and

11:00:04  1   the Italian version of the company, Soto Massini Italy.

11:00:09  2   There is no dispute at this point that Soto Massini (USA) is

11:00:13  3   properly part of the dispute going forward, so if it's okay

11:00:16  4   with Your Honor, I would just start there.

11:00:18  5           I think as we get into some of the issues, I

11:00:22  6   think you're going to see there is some interplay with

11:00:26  7   motion to compel because some of the relevant evidence still

11:00:30  8   hasn't materialized.  That's one of the reasons why we filed

11:00:33  9   the motion to compel.

11:00:34 10           THE COURT:  I have read all of the papers on the

11:00:37 11   motion, the supplemental submissions as well as the motion,

11:00:44 12   the discovery sanctions and production, so you can do

11:00:48 13   whatever you want in the argument, but since I have only

11:00:51 14   given you thirty minutes I thought I should tell you that I

11:00:54 15   have read all of that so you don't have to give me every bit

11:00:57 16   of background you might otherwise.

11:01:00 17           MR. LYONS:  Thank you, Your Honor.

11:01:01 18           Well, starting first with the motion to dismiss

11:01:05 19   and why we believe that it would be appropriate for this

11:01:09 20   case to go forward with not only Soto Massini (USA), but

11:01:17 21   Mr. Pichler, and also with the Italian company, we believe

11:01:22 22   all three entities should be part of the case.  Some of the

11:01:25 23   recent submissions from defense counsel, they really have

11:01:31 24   been emphasizing and putting forth this is a one-man show.

11:01:35 25   He is everything.  He's everyone.  It's really just him,

11:01:40  1   whatever name you want to put on it.  And we think there is

11:01:43  2   a lot of different ways you can get to jurisdiction, for

11:01:47  3   example, of Mr. Pichler.

11:01:50  4        We think he is a direct actor in this case, so

11:01:54  5   we think the Long Arm Statute in Delaware applies directly

11:01:57  6   to his conduct.  And, you know, one of the key aspects of

11:02:02  7   that that we focused on was they have said all of the

11:02:06  8   infringing sales in this case are from the Kickstarter

11:02:11  9   campaign and the Indiegogo campaign.  We're going to talk a

11:02:15 10   little more about some of the other sales that are

11:02:18 11   unaccounted for, but there is no dispute that is one of the

11:02:21 12   major focuses of the lawsuit.  And Mr. Pichler started that

11:02:26 13   campaign in his own name.

11:02:30 14        Now, he suggest in his papers that they require

11:02:34 15   that, or there is some -- you can't participate in those

11:02:38 16   processes as a company.  That's just not true.  We put into

11:02:42 17   our papers and we quoted for Your Honor the portion of the

11:02:46 18   rules where they said an organization can do it.  I mean,

11:02:50 19   there is no issue with somebody, an individual appearing in

11:02:54 20   connection with that if the company starts it, but in this

11:02:57 21   case, it wasn't Soto Massini (USA) starting those campaigns,

11:03:03 22   it was Mr. Pichler doing it personally.

11:03:05 23        And the whole purpose of those campaigns were to

11:03:08 24   sell products nationally, including to sell Delaware.  And

11:03:11 25   at this point it's undisputed that they did actually succeed

11:03:15 1    in getting sales in the U.S., and so you have got him doing

11:03:19 2    business personally in the U.S.  You have got him taking

11:03:24 3    steps that led to the tortious conduct, the infringing

11:03:28 4    conduct that gave rise to our claim.  So I think you have

11:03:33 5    got all that conduct that would allow you to just keep him

11:03:36 6    in the case personally just based on his own personal

11:03:39 7    infringing conduct outside of the corporation.

11:03:42 8         So we have also submitted evidence in the

11:03:44 9    supplemental submissions about how he uses, for example, his

11:03:48 10   personal Facebook account to talk about company business.

11:03:52 11   And so he really has been the personal driver, and for that

11:03:58 12   reason alone you could assert jurisdiction over him.

11:04:01 13        But there are two other theories as well.  Maybe

11:04:04 14   one of the simplest ones is just an agency theory.  I think

11:04:08 15   as he said his companies are really just, they're just him

11:04:12 16   and they act as his agents.  And so even if the Court

11:04:16 17   focused on Soto Massini(USA) as sort of the vehicle for

11:04:23 18   establishing jurisdiction which is undisputed, it's clear

11:04:27 19   that Soto Massini(USA) is just an agent for Mr. Pichler.  He

11:04:32 20   controls and dominates it.  Every decision they have made

11:04:36 21   about infringement has been his decision.  We think that

11:04:39 22   opens the door to exercising jurisdiction over him through

11:04:45 23   this agency theory.

11:04:47 24        THE COURT:  What is the test for an agency

11:04:49 25   theory that you're asserting?

11:04:54  1        MR. LYONS:  Well, in this case I think it's

11:04:56  2  showing that they're dominating and controlling the party

11:05:01  3  that is acting as an agent.  So the agent is under the

11:05:06  4  dominion and control of the individual.  I think in this

11:05:10  5  case that's exactly where we are with Mr. Pichler by his own

11:05:15  6  assertions.

11:05:18  7        We also think that there is a justifiable basis

11:05:22  8  for asserting jurisdiction over Mr. Pichler based on an

11:05:25  9  alterego theory and piercing the corporate veil.

11:05:30 10        And, you know, we've already established through

11:05:34 11  his own statements that he's a one-man show.  He does

11:05:37 12  everything.  It's his company.  But we found -- there is a

11:05:41 13  number of reasons why I think it makes sense for this Court

11:05:44 14  to pierce the corporate veil, get behind the corporation in

11:05:47 15  this case.

11:05:48 16        First of all, there has just been a complete

11:05:52 17  collapse in the following of corporate formalities.  The

11:05:57 18  most recent submissions, probably the most stunning where

11:06:00 19  they acknowledge that they haven't been filing any taxes.

11:06:03 20  They were incorporated in 2016.  They didn't file taxes in

11:06:06 21  2016, in 2017, and they haven't yet for 2018, either.

11:06:14 22        They were set up and operating in California.

11:06:21 23  That's where they have a facility where all the shoes that

11:06:23 24  they're distributing to customers worldwide are received and

11:06:28 25  put through some sort of qualification or review process.

11:06:33 1   They never registered with the California Secretary of State

11:06:37 2   as doing business in the State of California.  No formal

11:06:43 3   financial corporate records at all.  I mean, it's just, it's

11:06:48 4   stunning.

11:06:49 5          And the response has simply been, well, you

11:06:53 6   know, we're going to hire an accountant and we're going to

11:06:57 7   get to it.  This corporation has been in existence since

11:07:00 8   2016.  And it's just outrageous that they're getting through

11:07:05 9   at this point, specific admissions, they don't have a profit

11:07:08 10  and loss statement, they don't have an accounting data basis

11:07:12 11  or direct admissions from the principal, it's just amazing.

11:07:15 12  The primary excuse for that was well, we didn't really do

11:07:20 13  any business before 2016.  As we've seen, that's not

11:07:25 14  accurate.  When we get into some of the -- some of the other

11:07:28 15  really stunning things that have come to light is a lot of

11:07:32 16  the assertions that they have made about the business, we

11:07:35 17  have just categorically found to be false.  They been

11:07:41 18  selling, for example, in brick and mortar stores.  We have

11:07:44 19  photographs of the storefronts.  We have gone to the stores.

11:07:47 20  We have bought their shoes.  This after the principal,

11:07:50 21  Mr. Pichler, testified every way that you can imagine that

11:07:54 22  he's never sold at a brick and mortar store.  He's never

11:07:58 23  sold outside of the Kickstarter Indiegogo.

11:08:02 24         So the whole -- the collapse of the corporate

11:08:06 25  formalities has made it just all that much more difficult to

11:08:10  1    figure out what's going on with these companies.

11:08:12  2        This is just a facade for Mr. Pichler.  That's

11:08:17  3    one of the factors the Court looks at, not only whether

11:08:23  4    there has been a failure to respect the corporate

11:08:28  5    formalities, but I think even Mr. Pichler appears to

11:08:29  6    acknowledge that it's really just a facade for him.  There

11:08:32  7    is really not a functioning board and officers, it's just

11:08:35  8    Mr. Pichler making decisions.  And those are three of the

11:08:39  9    main factors that are often considered in deciding whether

11:08:43 10    an alterego ruling should be found.

11:08:48 11        I would note that a lot of the financial factors

11:08:51 12    that are considered, things like undercapitalization,

11:08:55 13    nonpayment of dividends, siphoning of funds to the primary

11:09:02 14    shareholder, all these financial questions, they really

11:09:05 15    going to our motion to compel where he admits he's got all

11:09:08 16    these bank records that haven't been produced.  He's given

11:09:11 17    us a carefully choreograph set of screen shots that must

11:09:17 18    have taken him a lot longer to put together than just

11:09:20 19    copying the bank statements would have been.  He now says

11:09:23 20    that all these papers have mysteriously vanished into the

11:09:28 21    hands of some accountant who is summarizing them and at some

11:09:32 22    future unspecified date he's going to share them with us.

11:09:35 23        We're two months past the close of fact

11:09:38 24    discovery.  We have got trial approaching in April.  All of

11:09:42 25    this, when it comes to the alterego, the evidence that we

11:09:45  1    have is more than enough, I think, to justify piercing the

11:09:48  2    corporate veil.  But it's also the evidence that we don't

11:09:53  3    have that's been withheld that should have been produced and

11:09:57  4    wasn't.  We think even if you look at a sanction, we think

11:10:01  5    that also would justify piercing the corporate veil.

11:10:05  6            So when we look at this case, we just see no

11:10:08  7    justification for allowing Mr. Pichler to hide behind the

11:10:13  8    corporation.

11:10:13  9            I have to say, the reason this case -- one of

11:10:17  10   the first things that happened in this case is we filed a

11:10:20  11   motion for a preliminary injunction that was heard by Judge

11:10:25  12   Sleet.  And we were very concerned that the funds that were

11:10:29  13   coming into the company from Kickstarter, from Indiegogo

11:10:35  14   were going to disappear.  And Mr. Pichler basically told the

11:10:38  15   Court, he said, I live in San Diego.  I have got two

11:10:43  16   school-aged kids.  And Judge Sleet said I originally was

11:10:46  17   concerned this was essentially a flight risk sort of

11:10:49  18   situation was the word that he used, and he got a

11:10:52  19   declaration and essentially told him, you know, he's not

11:10:55  20   going anywhere.  Well, Mr. Pichler is now gone.  He has left

11:11:00  21   the country.  He liquidated all of his assets in California.

11:11:04  22   He now lives in Columbia.  I mean, we have got him --

11:11:08  23   literally we took his deposition in Miami.  And I think even

11:11:13  24   that night he was leaving the country for Columbia.

11:11:16  25           And so I think this is a case where we've had a

11:11:21 1    party who has been making representations over and over

11:11:24 2    which have just proven not to be reliable.  And I think the

11:11:29 3    use of the corporate form to shield himself personally from

11:11:36 4    any liability in this case really is not in any way

11:11:39 5    justified.

11:11:39 6            There is another defendant in this case, the

11:11:43 7    Soto Massini Italy entity.  Mr. Pichler in his declaration

11:11:49 8    said over and over again, this is a company that has never

11:11:52 9    done anything.  Has never done -- he submitted to Judge

11:11:57 10   Sleet in the motions relating to the preliminary injunction

11:12:02 11   that this company has never done anything.  It doesn't have

11:12:04 12   any activity.  It has never transacted business of any kind.

11:12:08 13           THE COURT:  Where is the evidence that that

11:12:10 14   company has ever done anything in the United States?  I saw

11:12:13 15   this in the supplemental filings.  You sort of said oh, it's

11:12:18 16   all kind of one thing under Mr. Pichler.  But I don't really

11:12:22 17   see any evidence of action of the Italian company in the

11:12:26 18   United States.

11:12:27 19           MR. LYONS:  Well, what was conceded in

11:12:29 20   Mr. Pichler's deposition is that there is an iPhone app,

11:12:35 21   Android app that was registered in the name of the Italian

11:12:40 22   company.  And that customers in the U.S. use that to measure

11:12:47 23   their feet and size them.

11:12:51 24           THE COURT:  Is that an act of infringement,

11:12:52 25   though?

11:12:53  1          MR. LYONS:  Well, it's certainly supporting the

11:12:54  2    sales which is an act of infringement.

11:12:56  3          THE COURT:  But measuring your feet isn't

11:12:59  4    offering it for sale or selling; right?

11:13:01  5          MR. LYONS:  I agree, Your Honor.  Just that

11:13:03  6    alone wouldn't qualify.  And I will say, Your Honor, I think

11:13:07  7    from our perspective, the most important thing is that

11:13:12  8    Mr. Pichler be personally responsible in this case.  We also

11:13:16  9    think his Italian company, they have played a role in

11:13:21 10    supporting the sales, so we think it would be appropriate,

11:13:26 11    but I think it's probably less significant that they become

11:13:29 12    a party to this case.

11:13:33 13          THE COURT:  Why don't we talk about the

11:13:38 14    discovery issues and the sanctions.

11:13:41 15          MR. LYONS:  Certainly.

11:13:41 16          THE COURT:  I certainly understand your

11:13:43 17    frustration with the discovery issues in reading through

11:13:46 18    this and reading the response.  Where I'm uncertain, though,

11:13:54 19    is in your request for adverse inferences, essentially

11:13:59 20    sanctions under Rule 37.  And even in the case that you

11:14:02 21    cited to me there was an order that had essentially been

11:14:06 22    violated before the sanctions came into play.  And I don't

11:14:09 23    see that here because even in my prior order, I didn't

11:14:13 24    really order the production of the documents which perhaps

11:14:16 25    was my issue, but I don't have that here.  So I need to

11:14:21 1   understand and what I was hoping for when I asked for some

11:14:25 2   legal support was what is the basis to seek sanctions at

11:14:30 3   this point?

11:14:32 4           MR. LYONS:  I agree with Your Honor, there was

11:14:36 5   not a direct order to produce documents.  I think the path

11:14:41 6   to a sanction here is really where withholding and hiding,

11:14:46 7   actively hiding relative evidence is tantamount to

11:14:54 8   spoliation or failure to produce.  And so this is more of a

11:14:58 9   Rule 37(e) type situation rather than where there is a

11:15:00 10  direct order, produce this now and then it wasn't produced.

11:15:04 11          You know, the facts here are pretty stunning.  I

11:15:07 12  mean, Mr. Pichler could not have been more emphatic in

11:15:14 13  saying that they have never sold any products in a brick and

11:15:17 14  mortar store.  He said that repeatedly.  I asked him at his

11:15:21 15  deposition, "You never sold, for example, in a store in

11:15:25 16  Milan?"

11:15:25 17          "No, absolutely not."

11:15:26 18          Well, as I said, and as we submitted, Your

11:15:29 19  Honor, we have got pictures of the storefront where he's

11:15:33 20  selling them.  We now have a representation from counsel

11:15:35 21  where they basically admit, oh, well, there were some sales,

11:15:39 22  but don't worry about it.  There weren't that many and it

11:15:42 23  was all done at cost.  But, of course, that's what they have

11:15:45 24  been telling us in the U.S., too, they said he's made no

11:15:50 25  money, he only sells at cost.  And he only sells through

11:15:54 1   these two campaigns.

11:15:57 2                So we now have absolute proof that he was hiding

11:16:00 3   sales of accused products.  And it wasn't just the Italian

11:16:05 4   sales, we have evidence about their sales through

11:16:08 5   Kickstarter and through Indiegogo, but we also knew about

11:16:13 6   their own online stores, the VIPSotoMassini.com.  And they

11:16:20 7   said you can't buy shoes there unless you're a backer.

11:16:24 8   Well, we have bought shoes there.  My paralegal bought shoes

11:16:28 9   there.  The expert in this case bought shoes there.  They

11:16:31 10  weren't backers, they went on and did this.

11:16:34 11               And as we submitted in this Exhibit 4 -- no,

11:16:38 12  sorry, that's our -- that's the photo of the storefront.

11:16:42 13               In our Exhibit 6, I'm sorry, we actually have

11:16:48 14  messages from his associates who he had a team of people who

11:16:54 15  were helping him to promote his shoes.  And in those

11:17:00 16  messages, we have Tracy LeCoist saying oh, I just talked to

11:17:06 17  Mr. Pichler and he said we can sell these on Soto Massini

11:17:09 18  and it doesn't even matter if they were backers.  It is a

11:17:13 19  direct quote from his associate saying she got this

11:17:17 20  directive from him.

11:17:18 21               The full quote is, "So Thomas" -- that's

11:17:22 22  Mr. Pichler -- "just told me that anyone can order through

11:17:25 23  the VIP stores, even if they didn't back the KS," -- that's

11:17:30 24  Kickstarter project -- "which I didn't realize.  We're now

11:17:33 25  advertising it, but can PM" -- that's private message --

11:17:37  1   "people with a link to the store if they ask how they can

11:17:41  2   get the shoes.  Here is the link.  VIP.SotoMassini.com."

11:17:48  3          So here again we have got sales of accused

11:17:50  4   products that they denied existed over and over; that when

11:17:55  5   we moved to compel, they told Your Honor nothing exist.

11:17:59  6   Basically when they're getting caught, they're dribbling out

11:18:04  7   a little bit more information.  And at some point, it

11:18:08  8   amounts to spoliation of evidence.

11:18:12  9          I mean, the evidence if it's not being produced,

11:18:17 10   then it's being withheld and effectively destroyed.  And I

11:18:22 11   think that gives the Court the power to issue sanctions.  At

11:18:28 12   the very least to find that the withheld discovery would

11:18:31 13   have been very favorable to us, or when you look at the

11:18:34 14   Monsanto case that we cite, that was the one with the facts

11:18:39 15   that most closely paralleled what was going on here because

11:18:45 16   you had a defendant basically denying the existence of

11:18:48 17   accused products.  In that case it was these patented seeds.

11:18:51 18   And no, no, no, don't look here, there are no seeds here and

11:18:56 19   then we go find seeds at the neighbor's barn.  And of course

11:19:00 20   they had some there.  Where are the next ones?

11:19:02 21          We don't know where else they may be selling

11:19:06 22   these.  At some point it's not fair in our view to put the

11:19:09 23   burden on us when it's been proven that this defendant has

11:19:13 24   just flat out been dishonest in revealing the full scope and

11:19:19 25   nature of the sales.

11:19:21  1          So in our view, we think we're in the Monsanto

11:19:25  2   situation where a finding of infringement would be

11:19:27  3   appropriate, but at the very least a finding of an adverse

11:19:31  4   inference that the withheld information would be very

11:19:35  5   favorable to us.

11:19:36  6          We talked a little bit about the bank records

11:19:39  7   already.  You know, this is something that definitely hurt

11:19:45  8   us in our ability to put together the complete story on

11:19:48  9   alterego.  If we had all the banking information, we would

11:19:52 10   have a better idea of what's been going on on the funds.  I

11:19:56 11   think it's appropriate for Your Honor to rely on the failure

11:19:59 12   to timely provide those bank records at the very least as

11:20:03 13   further support for a ruling piercing the corporate veil as

11:20:09 14   to Mr. Pichler as an individual.  And certainly -- and we

11:20:16 15   still don't have those documents.  They're still not out

11:20:20 16   there.

11:20:20 17          The cost summaries, some of the things that have

11:20:24 18   happened in this case, you just scratch your head.  The

11:20:27 19   evidence they gave us for costs was essentially just a

11:20:30 20   handwritten document that Mr. Pichler put together.  And

11:20:34 21   then at his deposition when he sees this document, he says

11:20:37 22   well, this is not even the latest draft of this.  And I

11:20:41 23   prepared another draft with my lawyer.  This is a lawyer in

11:20:47 24   California, Mr. Lobbin, not counsel who is present, and for

11:20:51 25   whatever reason that counsel never provided that to us.  In

11:20:55  1   fact, it was just produced very, very recently, months after

11:20:58  2   the deposition.  Again, we don't have any of this relevant

11:21:02  3   information when we needed it.

11:21:04  4           Another just -- and we don't have any of the

11:21:08  5   underlying data.  So that's where when you get into costs,

11:21:13  6   you have got these sort of handwritten just sort of, I don't

11:21:17  7   know what you call them, just his sort of assertions of

11:21:21  8   costs without any underlying data.  And when you're talking

11:21:25  9   about, you know, this is somebody who has a small operation

11:21:27 10   making shoes, what are your major costs going to be?  Well,

11:21:31 11   who is making the shoes?

11:21:34 12           So this is a case where there are no agreements

11:21:39 13   that have been produced between anyone and the company that

11:21:44 14   makes the shoes, no invoices.

11:21:46 15           THE COURT:  Where are the shoes made?

11:21:49 16           MR. LYONS:  Sri Lanka.

11:21:51 17           So what Mr. Pichler testified in his deposition

11:21:53 18   was this company called Service in Sri Lanka who he has a

11:22:00 19   relationship, and the shoes are manufactured there.  They're

11:22:07 20   shipped to Pakistan where they're sort of boxed into a form

11:22:15 21   that they could then be sold to customers, so they put like

11:22:18 22   a care card and the packaging.  That all then gets shipped,

11:22:23 23   at least at the time of his deposition, he said, to a

11:22:27 24   warehouse space that he rents in California where they kind

11:22:31 25   of confirm everything, and then shipped directly to

11:22:36 1    customers from this warehouse in California.  That's our

11:22:39 2    understanding of the process.

11:22:41 3              We know that because Mr. Pichler told us that's

11:22:45 4    how it happens.  We basically have no documents that really

11:22:49 5    authenticate any of this.

11:22:50 6              In his deposition, he did give us one agreement

11:22:55 7    with this service company, and it was signed by Mr. Pichler

11:23:00 8    in his own individual capacity, nothing to do with Soto

11:23:04 9    Massini.  He brought it out when I was asking him about

11:23:08 10   sales of the accused products as evidence of who was making

11:23:12 11   the accused products.  And the more recent submissions to

11:23:15 12   the court, he said oh, that had to do with an earlier

11:23:19 13   product.  It had nothing to do with anything in this case.

11:23:22 14             So we're kind of back to square one where the

11:23:25 15   only piece of paper that we have ever seen that reflects the

11:23:30 16   relationship with his manufacturer they said was irrelevant.

11:23:34 17   But the one important fact about it is it was in the name of

11:23:38 18   Mr. Pichler himself and not his company.

11:23:40 19             But it puts us in a position to try to determine

11:23:43 20   costs with no reliable underlying data and documents with a

11:23:47 21   company who does not keep any real business records, they've

11:23:52 22   admitted that, although they're saying they're trying to

11:23:56 23   create somehow as we're heading to trial.  As you have seen

11:24:01 24   in the cases that we have submitted, a number of courts have

11:24:05 25   found where there has been discovery failures with regard to

11:24:08  1    providing evidence of costs that the appropriate sanction is

11:24:14  2    that a party can't use those costs to argue for a reduction

11:24:19  3    in the profits made by the company.  You just look at the

11:24:22  4    revenue and you don't deduct the costs.  We think that's

11:24:27  5    more than appropriate under the circumstances here when two

11:24:30  6    months after discovery, we don't have any credible evidence

11:24:34  7    at all related to costs.

11:24:36  8            And the very last issue, Your Honor, in all

11:24:40  9    this, and this was just another stunning one for

11:24:46 10    Mr. Pichler's deposition.  This is a case about trademark

11:24:49 11    infringement, and you know, one of the issues that's so

11:24:54 12    important is likelihood of success and showing secondary

11:24:59 13    meaning of our products.  And so, of course, one of the

11:25:03 14    things we asked for was any correspondence with their

11:25:07 15    customers, Soto Massini customers where they referenced our

11:25:11 16    client, Gavrieli, or our client's trademark products, the

11:25:20 17    Tieks shoe.  This was about a month after counsel had

11:25:23 18    represented to Your Honor that every single relevant

11:25:26 19    document had been produced.  And I asked Mr. Pichler a

11:25:31 20    simple question.  I said, did you look at any of these

11:25:34 21    e-mails which he then by that point admitted in his

11:25:37 22    deposition that he had gotten many, many customer e-mails.

11:25:41 23    I said did you look for any e-mails for Tieks or Gavrieli,

11:25:46 24    he said nope, I did not.  There was not even the tiniest

11:25:51 25    effort made to do that.

11:25:52  1          Since that time -- their initial response to

11:25:55  2   that was they were not going to produce them anyway.  As we

11:25:59  3   have escalated and threaten to file letter briefs and filed

11:26:04  4   letter briefs, we have now gotten a handful of those

11:26:08  5   e-mails, but frankly --

11:26:08  6          THE COURT:  And those are from at least the

11:26:10  7   support at Soto Massini, but you also still want them from

11:26:16  8   T. Pichler at Soto Massini; right?

11:26:19  9          MR. LYONS:  We want a full set of all the

11:26:22 10   e-mails.  The handful that we have certainly we think we're

11:26:28 11   entitled to, we're entitled to everything.  We really have

11:26:31 12   no confidence that we have got them.  And frankly after some

11:26:34 13   of the other things that we have been told that on further

11:26:38 14   investigation didn't stand up, we're really skeptical about

11:26:42 15   whether we're going to get them.  That's why we think an

11:26:45 16   appropriate adverse inference at this point is that there

11:26:51 17   are e-mails that support the likelihood of confusion and

11:26:56 18   support the idea that the Tieks brand has achieved secondary

11:27:02 19   meaning, we think that's the appropriate relief, because we

11:27:07 20   have no confidence we're ever going to get a full set of

11:27:12 21   documents at this point, Your Honor.

11:27:13 22          THE COURT:  Okay.  Mr. Stamoulis.

11:27:27 23          MR. STAMOULIS:  Good morning, Your Honor.  So we

11:27:35 24   can start at the beginning again and go through the motion

11:27:38 25   to dismiss issues if you like.

11:27:40  1              THE COURT:  Please.

11:27:41  2              MR. STAMOULIS:  So with regard to Mr. Pichler,

11:27:46  3     you know, it's interesting being on this side of the table

11:27:50  4     because the law that's being asserted by the defendants

11:27:55  5     here -- I'm sorry, by the plaintiffs here is what I wish was

11:27:58  6     the law when I'm a plaintiff.

11:28:01  7              So you know, in the first instance, I think what

11:28:05  8     we have here is a situation where you have a sole

11:28:09  9     proprietorship.  And if you break down their argument with

11:28:15 10     regard to how this business is run, I don't see how any sole

11:28:21 11     proprietorship would survive the agency test and the

11:28:29 12     alterego test that they're putting forward here.  Clearly if

11:28:33 13     you're going to have a sole proprietorship business, you're

11:28:36 14     going to have one person that's going to dominate the

11:28:39 15     company, one person that's going to do all the research and

11:28:42 16     development and marketing.  So there essentially would be no

11:28:45 17     purpose in creating a corporation, you know, if you are to

11:28:51 18     pierce the veil and hold an agency theory to be valid any

11:28:58 19     time that you have that kind of close interaction because

11:29:01 20     you're always going to have that close interaction with a

11:29:05 21     sole proprietorship.

11:29:05 22              So, you know, clearly there is an

11:29:13 23     unsophisticated nature to the company.  I mean, you know,

11:29:17 24     there is no excuse for not filing tax returns because you

11:29:20 25     didn't think you didn't do any business.  But certainly that

11:29:27  1     kind of failure, you know, does not rise to the level of

11:29:36  2     piercing the corporate veil or holding an agency here.

11:29:40  3                THE COURT:  What about the argument that you say

11:29:42  4     look, they only come up with two, one or two at most of the

11:29:48  5     factors that the Third Circuit looks at for the alterego

11:29:53  6     theory, but I take Mr. Lyons' point that some of the stuff

11:29:56  7     that he's asked for that might support it and in light of

11:30:00  8     allegations that have been made may very well support it you

11:30:03  9     haven't produced to him.  Why can't I, at least for the

11:30:07 10     purposes of this motion, have an adverse inference that

11:30:11 11     those documents would support the argument that plaintiff is

11:30:15 12     making?

11:30:18 13                MR. STAMOULIS:  If we jump to the document issue

11:30:20 14     for a moment, I think a lot of the documents that they are

11:30:24 15     requesting are documents that need to be created, that

11:30:28 16     didn't exist at the time that they asked for them.  And that

11:30:32 17     --

11:30:32 18                THE COURT:  But they asked for them a long time

11:30:34 19     ago.  And now you're telling me two months after fact

11:30:38 20     discovery has ended, or almost two months after fact

11:30:42 21     discovery has ended that you still need to create.  So I

11:30:47 22     take their frustration here.  You knew when the trial was.

11:30:50 23     You knew when discovery was.  You knew that the documents

11:30:53 24     were asked for.  But your client is now just making up

11:30:56 25     documents from 2016?  If you were the plaintiff, wouldn't

11:31:00 1    you find that somewhat objectionable?

11:31:04 2          MR. STAMOULIS:  Your Honor, I think that at

11:31:06 3    least in terms of the adverse inference that they're looking

11:31:10 4    for, if there were documents that existed that were there

11:31:15 5    and available and that weren't turned over, that's one

11:31:19 6    thing.  If there is documents that need to be created, I

11:31:22 7    think that's a different category.  And so I think in this

11:31:26 8    situation, especially because, you know, these are documents

11:31:30 9    that are not going towards liability, they're going towards

11:31:35 10   damages.

11:31:35 11         And so, you know, I don't think it rises to the

11:31:41 12   level given the circumstances and the situation where an

11:31:46 13   adverse inference would be appropriate.  And also, as Your

11:31:49 14   Honor noted, the fact that there was no order from the Court

11:31:55 15   directing a date certain for something to be done

11:32:00 16   affirmatively by the defendant here in terms of creation.

11:32:06 17         The one point I would also throw out there just

11:32:11 18   before we leave the motion to dismiss stage, there are

11:32:16 19   design patent claims that are at issue here, and I believe

11:32:21 20   that TC Heartland would apply to design patent claims.  I

11:32:24 21   have not seen that addressed.  But I don't think that there

11:32:27 22   is any question that Mr. Pichler personally, not a resident

11:32:31 23   of the State of Delaware, there would be no personal

11:32:33 24   jurisdiction against him in the State of Delaware that would

11:32:36 25   be appropriate under TC Heartland.

11:32:39  1           THE COURT:  Is that in your brief?

11:32:41  2           MR. STAMOULIS:  I'm new to this case.  And a lot

11:32:44  3   of these papers were drafted long before I came to this

11:32:47  4   case.  But having seen that, it's the first thing that, you

11:32:52  5   know, jumped out at me that really merely being associated

11:32:59  6   with a company I don't think overcomes the law of

11:33:05  7   jurisdiction under TC Heartland.  I wish it did, I would use

11:33:09  8   that all the time as a plaintiff.  But that's just not the

11:33:14  9   law.  So that is -- that's what I have to say about

11:33:21 10   Mr. Pichler and his personal jurisdiction here.

11:33:26 11           Soto Massini, I don't know if Your Honor is

11:33:28 12   interested in hearing anything about that.  Obviously the

11:33:34 13   loose jurisdictional theory that they're applying here where

11:33:39 14   they're implying some sort of agency and being able to bring

11:33:42 15   in the foreign company because they themselves have deemed

11:33:48 16   the U.S. company an agent of that foreign company, I wish

11:33:53 17   that was the law.  If I could bring in Samsung Korea every

11:33:56 18   time I sued Samsung USA just because I say they're the

11:34:00 19   agent.

11:34:00 20           THE COURT:  What about trade dress, you

11:34:02 21   mentioned the patent issue, what about trade dress and false

11:34:07 22   advertising and a number of the others?

11:34:12 23           MR. STAMOULIS:  For that we go back to whether

11:34:14 24   Mr. Pichler acted in his individual capacity or acted as a

11:34:18 25   sole proprietor of a corporation that he duly formed and

11:34:21 1    incorporated in the State of Delaware.  And I think that the

11:34:27 2    law in the State of Delaware is fairly sophisticated with

11:34:31 3    regard to what it takes to disregard the corporate form.  I

11:34:37 4    think it's a tough nut to crack in Delaware.  And I think

11:34:41 5    even with the lack of the filing of the tax returns, I don't

11:34:47 6    think that at this stage they have pled sufficient facts so

11:34:52 7    that this Court can just say that it's appropriate to

11:34:56 8    disregard the corporate formalities and hold him personally

11:34:59 9    responsible for the actions of the company.

11:35:01 10           I think that's something, at least in my

11:35:04 11   experience, that's something that comes down the line is,

11:35:08 12   you know, that if and when there is liability in this case,

11:35:16 13   and if and when they feel that they cannot get satisfaction

11:35:19 14   by going after Soto USA, then there is a separate action to

11:35:25 15   pierce the corporate veil in the Court of Chancery.

11:35:30 16           I'm dealing with that exact matter right now

11:35:32 17   where we had an infringement trial and the other party felt

11:35:38 18   that the corporate veil should be pierced and we're

11:35:44 19   proceeding in the Court of Chancery for that.  Judge

11:35:48 20   Robinson didn't have to deal with that.

11:35:49 21           So I think that would be the appropriate way to

11:35:52 22   deal with it here.  If they feel they need that extra step,

11:35:56 23   they should come after liability is established.

11:36:04 24           THE COURT:  Just one thing.  Sorry about that.

11:36:07 25   Go ahead.

11:36:08 1          MR. STAMOULIS:  Also, Your Honor, I will note

11:36:10 2     for the record, obviously you have the briefing on the

11:36:12 3     service issue for Soto Italy, again, implying an agency

11:36:17 4     relationship and serving a U.S. entity, I wish that was the

11:36:20 5     law.  I would do it all the time if it was.  It's not.  And

11:36:24 6     so I think it's very clear that Soto Italy is improper.

11:36:28 7          Again, with regard to the discovery, I have

11:36:31 8     already mentioned to Your Honor that most of the documents

11:36:37 9     that they're asking for are documents that need to be

11:36:40 10    created.  There hadn't been an existing order prior giving

11:36:44 11    them a date to create these documents.

11:36:48 12         They make a lot about these sales in Milan,

11:36:53 13    which I guess, you know, could go to the credibility of the

11:36:59 14    witness, you know, if, in fact, they knew about those sales

11:37:05 15    in advance.  But sales in Milan really have nothing to do

11:37:11 16    with any of the claims that are at issue before the Court,

11:37:16 17    before Your Honor.

11:37:17 18         THE COURT:  One moment.  I apologize.

11:37:24 19         MR. STAMOULIS:  There is no trade dress or

11:37:27 20    design patent liability for anything that happens overseas.

11:37:30 21         THE COURT:  Are the brick and mortar sales that

11:37:33 22    were referenced, are those only in Milan or are those

11:37:37 23    elsewhere?

11:37:38 24         MR. STAMOULIS:  All that I have seen has been

11:37:43 25    overseas.  And from the letters that were submitted, what

11:37:47  1    was represented to the Court is that there were a hundred

11:37:49  2    and so sample pairs that were produced that were given to

11:37:53  3    various vendors to look at and, you know, try, and

11:37:58  4    apparently some of those vendors turned around and started

11:38:01  5    selling them and they took pictures of them, but that

11:38:04  6    happened overseas.

11:38:05  7              And, you know, the same thing goes with these

11:38:10  8    VIP website sales.  So they structured the Kickstarter and

11:38:20  9    Indiegogo campaigns so that the sales would be done all

11:38:22 10    through those entities.  Apparently there was a workaround.

11:38:27 11    But what I will note, Your Honor, is that there was no sort

11:38:30 12    of intent to hide sales from that workaround.  I think

11:38:34 13    that -- I couldn't find the exact place in all the papers

11:38:38 14    that were produced, but I believe that the paralegal from

11:38:44 15    Morgan Lewis that got on and purchased the shoes, that that

11:38:47 16    sale was actually reported to them as an Indiegogo sale, so

11:38:54 17    it's not like they were hiding those sales, they were

11:38:57 18    lumping them in with the Indiegogo campaign.

11:39:01 19              So I think that also speaks to with regard to

11:39:06 20    whatever adverse inference Your Honor is considering, I

11:39:11 21    think proportionality should be something that Your Honor

11:39:15 22    thinks about.  Clearly I think it would be disproportionate

11:39:22 23    to have an adverse inference of liability and damages based

11:39:28 24    on the facts that are present here and the circumstances

11:39:32 25    that we're in.  And, you know, if Your Honor -- I mean, my

| | | |
|---|---|---|
| 11:39:40 | 1 | suggestion would be that if Your Honor would issue an order, |
| 11:39:44 | 2 | you know, providing a date certain, we will comply with it. |
| 11:39:50 | 3 | THE COURT:  What is the date certain you want? |
| 11:39:53 | 4 | MR. STAMOULIS:  Well, from what I'm told, Your |
| 11:39:56 | 5 | Honor, it really is one individual.  And, you know, and the |
| 11:40:02 | 6 | accountant that he has hired to try to pull all these things |
| 11:40:05 | 7 | in order that had not been put in order. |
| 11:40:08 | 8 | THE COURT:  But if he can give the accountant |
| 11:40:12 | 9 | the documents, certainly he can give them to Gavrieli's |
| 11:40:15 | 10 | counsel; right? |
| 11:40:16 | 11 | MR. STAMOULIS:  I don't know if the accountant |
| 11:40:18 | 12 | has gotten documents.  I think he has taken a computer. |
| 11:40:21 | 13 | THE COURT:  When you ask for a date certain, |
| 11:40:23 | 14 | what are you thinking of, because trial is set for April |
| 11:40:27 | 15 | 29th.  Expert reports are in the process.  So what are you |
| 11:40:30 | 16 | -- if I said a week. |
| 11:40:34 | 17 | MR. STAMOULIS:  I would like two weeks, if I can |
| 11:40:37 | 18 | make -- I know I haven't spoken to the client, but I think |
| 11:40:42 | 19 | given where we are, I don't think that -- I'll agree with |
| 11:40:46 | 20 | Your Honor that more than that would not be appropriate. |
| 11:40:49 | 21 | THE COURT:  Okay.  Anything else? |
| 11:40:56 | 22 | MR. STAMOULIS:  Nothing further, unless Your |
| 11:40:58 | 23 | Honor has questions. |
| 11:40:58 | 24 | THE COURT:  Mr. Lyons, one question I had for |
| 11:41:00 | 25 | you is when you're asking for documents to all sales of the |

1   accused products, are you asking for documents for worldwide

2   sales, U.S. sales, and if it's more than U.S. sales, I need

3   to understand the basis for that request.

4          MR. LYONS:  Well, we did ask for worldwide

5   sales.  And what Mr. Pichler testified to in his deposition

6   and as I described earlier, the way his network is set up,

7   they run everything through the U.S.  So they were

8   manufacturing it in Sri Lanka, goes to Pakistan and then

9   it's shipped to a warehouse in California.  So we think even

10  shoes that were going elsewhere in the world very likely

11  were being imported into the United States first, we think

12  it's relevant at least for that person.

13         THE COURT:  Is there anything you wanted to

14  respond to?

15         MR. LYONS:  Just very, very brief, Your Honor.

16  First of all in terms of timing, we do have expert reports

17  due on February 19th.  And so producing materials in two

18  weeks is not going to be very helpful for that process if

19  that's where this ended up.

20         I just wanted to in terms of the TC Heartland

21  issue, that was something that was raised for the first time

22  in the oral argument.  We have not had any time to look at

23  that.  It has been shown that there were direct sales into

24  Delaware in connection with the Kickstarter campaign, so we

25  think that would give you jurisdiction under TC Heartland or

11:42:44  1    any other standard.

11:42:48  2              That's all I had, Your Honor.

11:42:49  3              THE COURT:  Okay.  But before I -- I want to go

11:42:56  4    back and think about this and come back, but before I do

11:43:00  5    that, I want to talk a little bit about the schedule.  As

11:43:04  6    you suggested, we are a little crunched here, and I saw in

11:43:10  7    looking at the schedule that the way it's set up is that

11:43:13  8    summary judgment papers are to be filed on March 15th, which

11:43:18  9    would make them finished April 5th, and a pretrial

11:43:24 10    conference is April 16th.  So clearly if you expect me to

11:43:28 11    pay any real attention to the summary judgment papers, we're

11:43:33 12    going to have to move something.

11:43:37 13              So can I ask both sides, what's the plan here?

11:43:41 14    Are you planning to move for summary judgment?  And if so,

11:43:45 15    what do you expect me to do with those papers that I receive

11:43:49 16    less than a month before trial?

11:43:52 17              MR. LYONS:  Our focus has been on trial.  I

11:43:55 18    mean, there may be some specific issues that we would have

11:43:58 19    advanced that -- but I don't know that we were looking -- I

11:44:03 20    don't think we were going to proceed, Your Honor, with

11:44:08 21    comprehensive papers on every issue in the case.  I think it

11:44:11 22    would have been more selective.  But our plan has been to

11:44:14 23    meet the trial deadlines and go forward with the trial as

11:44:17 24    scheduled.

11:44:18 25              THE COURT:  What about defendant?

11:44:20 1      MR. STAMOULIS:  Your Honor, I don't believe that

11:44:22 2   we would move for summary judgment on any issue.  Anything

11:44:25 3   that we would bring before Your Honor would probably be in

11:44:27 4   the form of a motion in limine.

11:44:30 5      THE COURT:  And Mr. Lyons, if I were to keep the

11:44:36 6   trial date, would your client be willing to forgo filing of

11:44:42 7   summary judgment motions?  And that's something you can tell

11:44:46 8   me in the letter later this week if you want after you talk

11:44:51 9   with them.  But I'm not sure that we could have both,

11:44:56 10  summary judgment, at least in the way that I would have a

11:45:00 11  chance to read and think about and decide those motions in a

11:45:05 12  comprehensive way.

11:45:08 13     MR. LYONS:  Understood, Your Honor.  I can have

11:45:09 14  that conversation with my client.

11:45:10 15     THE COURT:  Let's just take a quick break and

11:45:13 16  then we'll come back.

11:45:15 17        (A brief recess was taken.)

11:56:42 18     THE COURT:  Please be seated.

11:56:44 19     Thank you for the arguments today.  They were

11:56:47 20  helpful.  And I am prepared to rule on the motion to dismiss

11:56:52 21  as well as the discovery issues.

11:56:55 22     First the motion to dismiss.

11:56:58 23     Defendants Thomas Pichler and SMS Italy have

11:57:03 24  moved to dismiss this case against them for lack of personal

11:57:07 25  jurisdiction and insufficient process under Rules 12(b)(2)

11:57:09  1   and 12(b)(5).  And there are also allegations that the

11:57:12  2   complaint fails to state a claim against these defendants

11:57:15  3   pursuant to 12(b)(6), but the arguments for the grounds are

11:57:18  4   all essentially the same.

11:57:20  5          The Court has reviewed the briefs submitted by

11:57:22  6   the parties in connection with their motion and supplemental

11:57:25  7   submissions submitted after discovery had occurred.  I have

11:57:28  8   also heard arguments today and for the reasons set forth

11:57:33  9   below I will deny the motion as to Mr. Pichler and grant the

11:57:36 10   motion as to SMS Italy.

11:57:38 11          When assessing personal jurisdiction, courts in

11:57:42 12   this district determine first whether Delaware's Long Arm

11:57:45 13   Statute permits jurisdiction and second, whether exercising

11:57:49 14   jurisdiction comports with due process.  To overcome a

11:57:55 15   jurisdictional challenge the plaintiff needs to make out a

11:57:55 16   prima fascia case showing jurisdiction is appropriate based

11:57:58 17   on pleadings, affidavits and other written materials.

11:58:02 18          The Court must accept as true all allegations of

11:58:04 19   jurisdictional fact construed in the pleadings and

11:58:08 20   affidavits in the plaintiff's favor.  The Delaware Supreme

11:58:10 21   Court has construed the state's long arm statute to confer

11:58:13 22   jurisdiction to the maximum extent possible under the due

11:58:17 23   process clause.  That statute 10 Delaware Code Section

11:58:22 24   3104(c) states in relevant part that personal jurisdiction

11:58:26 25   is proper for either the defendant or its agent one,

11:58:30  1   transacts any business or performs any character of work or

11:58:33  2   service in the state, or section, subsection 4 causes

11:58:37  3   tortious injury in the state or outside of the state by an

11:58:40  4   act or omission outside the state if the person regularly

11:58:44  5   does or solicits business, engages in other persistent

11:58:50  6   course of conduct in the state or derives substantial

11:58:52  7   revenue from services or things used or consumed in the

11:58:55  8   state.

11:58:56  9           Courts in this district have exercised personal

11:58:59 10   jurisdiction under a "dual jurisdiction theory," which is a

11:59:04 11   hybrid of Section (c)(1) and (c)(4), and that's been done

11:59:08 12   where there is a showing of "an intent to serve the Delaware

11:59:11 13   market and that the intent results in the introduction of a

11:59:14 14   product in the market and that plaintiff's cause of action

11:59:16 15   arises from injuries caused by that product."

11:59:19 16           Due process requires that the defendant has

11:59:23 17   sufficient minimum contacts with the forum state such that

11:59:27 18   the maintenance of the suit does not offend traditional

11:59:30 19   notions of fair play and substantial justice.  The plaintiff

11:59:34 20   bears the burden of establishing minimum context and upon

11:59:37 21   that showing the burden shifts to the defendant to prove

11:59:40 22   that the exercised jurisdiction would be unreasonable.

11:59:43 23           First, as to Mr. Pichler, he is a resident, or

11:59:48 24   was at the time of the filing, a resident of California.  He

11:59:51 25   submitted a declaration to the Court stating that he had

never been to Delaware and that any interaction he has had with the state has been in his capacity as a director of Soto USA.  The Court, however disagrees that the first amended complaint fails to allege jurisdiction for claims against Mr. Pichler.  First, this Court has jurisdiction over Mr. Pichler because the first amended complaint sufficiently alleges that he personally sold and offered for sale shoes infringing Gavrieli's design patent and trade dress right as well as falsely advertising the infringing shoes to the consumers in the United States including in Delaware.

Mr. Pichler is also subject to personal jurisdiction by virtue of this Court's jurisdiction over SM USA under an agency and under an alterego theory.  As to agency, Mr. Pichler controls SM USA and dominates it.  He has authorized the actions that are relevant to this case. SM USA is under his dominion and control.

As to an alterego theory to impute jurisdictional context to Mr. Pichler, Gavrieli need only prove that defendants functioned as a single entity and should be treated as such.  Relative factors in the Third Circuit include some of those that were discussed today, gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation

1  by the dominant stockholder, nonfunctioning of officers and

2  directors, absent corporate records and whether the

3  corporation is merely a facade for the operations of the

4  dominant shareholder.

5          Here, Gavrieli alleges facts sufficient to

6  sustain an alterego theory of jurisdiction over Mr. Pichler.

7  It alleges, for example, that Mr. Pichler is the sole owner

8  of SM USA and has installed himself as the director of SM

9  USA.  Mr. Pichler and SM USA use the same address, San

10  Diego, California.  SM USA shares the same employees,

11  directors, officers and employees that essentially is the

12  one person, Mr. Pichler.  Mr. Pichler and SM USA use the

13  same trade name, Soto Massini, disseminate the same product

14  catalogue and advertisements, operate the same social media

15  accounts and promote the same products.

16          Mr. Pichler failed to register SM USA with the

17  California Secretary of State despite conducting business in

18  California.  Mr. Pichler has according to the first amended

19  complaint personally controlled, directed and/or supervised

20  SM USA's infringing sales and offers for sale and their

21  design, manufacture and/or marketing of the infringing

22  shoes.

23          In addition, it seems clear that no corporate

24  formalities have been followed.  As stated in defendant's

25  discovery letters, SM USA is one man.  The company has been

12:02:55  1   in existence since 2016, but it has not prepared any

12:03:00  2   corporate records or financial documents and had not filed

12:03:04  3   tax returns.  There is no real board of directors.  It is

12:03:08  4   not registered to do business.

12:03:11  5          The company and the man, Mr. Pichler, are

12:03:13  6   indistinguishable regarding the issues in this case and

12:03:16  7   Mr. Pichler is subject to jurisdiction by virtue of this

12:03:22  8   Court's jurisdiction over SM (USA) under at least agency and

12:03:25  9   alterego theories.  The motion to dismiss him is therefore

12:03:29 10   denied.

12:03:30 11          As to SMS Italy, regarding general jurisdiction,

12:03:34 12   SMS Italy is a corporation organized in Italy with a

12:03:39 13   principal place of business in Milan.  It appears that all

12:03:43 14   of SMS Italy's activities are conducted in Italy.  With

12:03:46 15   respect to general jurisdiction in the amended complaint,

12:03:48 16   Gavrieli alleges that SMS Italy regularly and systematically

12:03:54 17   transacted business in its judicial district, yet there are

12:03:57 18   no facts to support that conclusion notwithstanding

12:04:00 19   Gavrieli's burden to show the necessary context with

12:04:02 20   Delaware.

12:04:03 21          It has not alleged context that are so

12:04:06 22   significant that as to have SMS Italy be essentially at home

12:04:12 23   in this forum.  Specific jurisdiction is also not present

12:04:16 24   because the amended complaint contains some conclusionary

12:04:20 25   allegations that SMS Italy placed infringing products into

12:04:23  1    the stream of commerce, but it does not allege that SMS

12:04:27  2    Italy has put products into the stream of commerce in the

12:04:31  3    United States, has done any advertising in the United States

12:04:32  4    or offered any products for sale in the United States.

12:04:35  5         It does not allege that SMS has any connection

12:04:38  6    to this forum other than through Mr. Pichler and SMS in his

12:04:44  7    ownership of SMS USA.  That does not satisfy the

12:04:48  8    requirements for personal jurisdiction.  And as this Court

12:04:52  9    has previously noted, mere ownership of a subsidiary or

12:04:57 10    having a corporate relationship does not justify the

12:05:01 11    imposition of liability on a parent.  So I'm going to grant

12:05:06 12    defendant's motion with respect to SMS Italy.

12:05:10 13         With respect to the motion to compel, I do find

12:05:15 14    it disturbing that we are here two months after the fact

12:05:19 15    discovery and there are documents that have not been

12:05:22 16    produced.  I am also troubled that it appears that there

12:05:27 17    have been changing positions on the existence of those

12:05:32 18    documents throughout the course of discovery.  That being

12:05:35 19    said, I am not yet convinced that I am in a position to

12:05:40 20    issue sanctions of the type that are requested by plaintiff.

12:05:43 21         So what I'm going to do is I'm going to order

12:05:46 22    that the defendant shall produce the documents that are

12:05:50 23    requested within two weeks.  To be clear, I am going to walk

12:05:57 24    through the documents that are requested in the January 30th

12:06:03 25    letter submitted by plaintiffs.

12:06:07 1        First, documents showing all sales of the

12:06:10 2   accused products.  I'm going to order that the defendants

12:06:14 3   produce documents showing all sales of the accused products

12:06:18 4   regardless of the channel by which they are sold.  The sales

12:06:22 5   should include worldwide sales as there has been an

12:06:26 6   allegation that the products are imported into the United

12:06:32 7   States, all of the products that are sold are imported first

12:06:35 8   into the United States which would be an act of

12:06:38 9   infringement.

12:06:39 10        With respect to Section B of the letter,

12:06:44 11   complete bank records and statements for SM USA's bank

12:06:48 12   accounts, I am going to order that those be produced.

12:06:51 13   Having pictures of certain screen shots is not sufficient to

12:06:57 14   satisfy the requirements for the requests in this case.

12:07:00 15        With respect to C and D, which go to cost

12:07:05 16   summaries for the accused products, I'm going to order that

12:07:08 17   the cost summaries be produced.  I understand that there has

12:07:12 18   been an updated handwritten document of cost summaries, but

12:07:15 19   in addition to that, I am ordering the production of the

12:07:20 20   underlying data for Mr. Pichler and the company that support

12:07:25 21   those numbers so that plaintiff can fairly look at those and

12:07:31 22   determine whether there are any issues.

12:07:33 23        Whether the underlying documents require

12:07:37 24   production of the invoices I can't tell at this point.  All

12:07:43 25   I'm going to say is to the extent that the underlying data

12:07:47  1   includes invoices, I'll order that those be produced.  If

12:07:50  2   that's not required, then you guys can have a discussion as

12:07:55  3   to the necessity of invoices.

12:07:57  4            E-mails sent to SM USA referencing Gavrieli or

12:08:04  5   Tieks, I'm going to order that a full set of all e-mails

12:08:07  6   from Mr. Pichler and the corporation including the e-mails

12:08:12  7   for the addresses Support@SotoMassini.com, and

12:08:18  8   TPichler@SotoMassini.com be produced to the extent that they

12:08:22  9   reference Gavrieli or Tieks.

12:08:25 10            And if there are other e-mail addresses for the

12:08:29 11   company or Mr. Pichler that are used for the company, those

12:08:35 12   should also be searched for references to Gavrieli or Tieks.

12:08:43 13            Now, the documents will be produced in two weeks

12:08:48 14   as defendants requested.  I understand that that may cause

12:08:52 15   some problems with respect to the current expert discovery,

12:08:55 16   and at first blush I will ask the parties to discuss with

12:08:59 17   each other what is required in order to proceed in a way

12:09:07 18   that makes sense going forward given the late production of

12:09:12 19   documents.

12:09:13 20            With respect to dispositive motions, defendants

12:09:19 21   have indicated they don't intend to file motions for summary

12:09:25 22   judgment but rather would probably file motions in limine

12:09:29 23   pursuant to my scheduling order and I would ask you to

12:09:32 24   follow my provisions, my procedures for motions in limine

12:09:36 25   that are outlined in my draft scheduling order.

12:09:41  1          Plaintiff, I will ask you to get back to me by

12:09:45  2    the end of this week as to whether you intend to file

12:09:49  3    motions for summary judgment and I do caution, as I said

12:09:52  4    before, that should those motions be filed, it will likely

12:09:55  5    jeopardize the trial date.

12:09:57  6          And I think with that, we have addressed the

12:10:01  7    issues that we have here today.  Is there anything else that

12:10:04  8    we should discuss?

12:10:12  9          MR. GORMAN:  Nothing from plaintiff, Your Honor.

12:10:15 10          MR. STAMOULIS:  Your Honor, if I could put a

12:10:16 11    reservation in, if plaintiff decides to go the motion route

12:10:20 12    and ends up kicking trial, at that point we might want to

12:10:24 13    have the opportunity to file a cross motion if we think it

12:10:28 14    will simplify the case.  But again, that wouldn't be our

12:10:32 15    choice, that would be if they decide to go that route and

12:10:35 16    lose the trial date, we want to have the ability if we

12:10:38 17    decide that something else is needed then.

12:10:40 18          THE COURT:  Well, I understand that you want to

12:10:43 19    put that reservation on the record and that is something

12:10:46 20    that the parties can discuss what makes sense if the

12:10:50 21    plaintiffs decide that they want to file motions for summary

12:10:53 22    judgment.

12:10:53 23          MR. STAMOULIS:  Thank you, Your Honor.

12:10:54 24          THE COURT:  Thank you.

12:10:55 25          (Court recessed at 12:10 p.m.)